1
2
3
4
5
6

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WASHINGTON

7
8
9
10
11

DEFENDERS OF WILDLIFE,
CONSERVATION NORTHWEST,
THE LANDS COUNCIL,
SELKIRK CONSERVATION
ALLIANCE, IDAHO
CONSERVATION LEAGUE, and
CENTER FOR BIOLOGICAL
DIVERSITY,

12              Plaintiffs,

13                   v.

14   SUSAN MARTIN, Upper Columbia
     River Field Office Supervisor, and
15   U.S. FISH AND WILDLIFE
     SERVICE; RANOTTA MCNAIR,
16   Idaho Panhandle Forest Supervisor,
     and U.S. FOREST SERVICE,

17              Defendants, and

18   IDAHO STATE SNOWMOBILE
19   ASSOC.; PRIEST LAKE
     TRAILS/OUTDOOR
20   RECREATION ASSOC.; WINTER
     RIDERS INC., an Idaho
21   Corporation, aka SANDPOINT
     WINTER RIDERS; PRIEST LAKE
22   CHAMBER OF COMMERCE; THE
     AMERICAN COUNCIL OF
23   SNOWMOBILE ASSOCIATIONS;
     and THE BLUERIBBON
24   COALITION,

25              Defendant-Intervenors.

NO.  CV-05-248-RHW

**ORDER GRANTING
PLAINTIFFS' MOTION FOR
PRELIMINARY INJUNCTION**

26
27   Before the Court is Plaintiffs' Motion for TRO and/or Preliminary
28

ORDER GRANTING PLAINTIFFS' MOTION FOR PRELIMINARY
INJUNCTION * 1

Injunction[1] (Ct. Rec. 35).  Plaintiffs seek immediate injunctive relief prohibiting Defendant USFS from implementing their "Challenge Cost-Share Agreement" for snowmobile trail grooming in certain areas of the Idaho Panhandle National Forest during the winter 2005-06, to protect the endangered Selkirk Mountains woodland caribou.  For the reasons stated below, the Court grants Plaintiffs' motion.

## BACKGROUND

Plaintiffs challenge the biological opinions issued by Defendants Martin and the U.S. Fish and Wildlife Service ("FWS" or "Service") and actions by Defendants McNair and U.S. Forest Service ("USFS") in violation of the Endangered Species Act ("ESA"), 16 U.S.C. § 1536.   The complaint alleges Defendants are allowing the decline of the remaining woodland caribou in the continental United States by implementing National Forest management actions.

In their first cause of action, Plaintiffs challenge the Service's 2001 Amended Biological Opinion finding that the continued implementation of Forest Plans will cause "no jeopardy" to the caribou in the Colville and Idaho Panhandle National Forests.  Plaintiffs claim this finding was arbitrary and capricious in violation of the ESA and the Administrative Procedure Act ("APA"), 5 U.S.C. § 701, because it was contrary to the Service's own research and analysis demonstrating that the continued implementation of these plans was contributing to the decline of the woodland caribou by allowing the intrusion of snowmobile activities into caribou habitat.

For their second cause of action, Plaintiffs allege the Service arbitrarily and

---

[1]  The parties came to an agreement on Plaintiffs' Motion for a Temporary Restraining Order, so the matter currently before the Court is a motion for a preliminary injunction only.  The agreement reached restricted snowmobile grooming on certain trails for a limited time and eliminated the need for a temporary restraining order.

ORDER GRANTING PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION * 2

capriciously concluded that the "Incidental Take" statements in the Biological Opinions would not jeopardize the caribou's continued existence, in violation of the ESA and the APA, 5 U.S.C. § 701.  Specifically, Plaintiffs state that the Incidental Take Statements are not based on the best available scientific information as required by the ESA, and further that they are arbitrary and capricious, an abuse of discretion, and contrary to law.  Plaintiffs claim these statements unlawfully authorize the unlimited "Incidental Take" of caribou in the implementation of the Forest Plans.

Plaintiffs' third cause of action charges Defendant USFS with violating the ESA's consultation and other requirements.  Plaintiffs assert USFS allows the displacement and harassment of caribou from their necessary habitat by promoting snowmobiling in their management of the National Forest Service lands, and thus violates the ESA.  Specifically, Plaintiffs challenge the failure to reinitiate consultation after USFS failed to develop a recreational management plan as required by the Service's 2001 Biological Opinion for the Idaho Panhandle National Forest.  Plaintiffs also challenge USFS's failure to consult when entering the Challenge Cost-Share Agreement, which Plaintiffs claim authorizes, promotes, and manages motorized winter recreation on the Idaho Panhandle National Forest.[2] Plaintiffs claim Defendant USFS violates its duties under the ESA to conserve the woodland caribou by failing to consult with the Service over the effects of snowmobiling and failing to create a plan to minimize the adverse impact on the endangered species.

The Court granted Defendant-Intervenors' permissive intervention by order on November 7, 2005 (Ct. Rec. 34).  Defendant-Intervenors consist of recreational groups (mostly snowmobiling groups) of two varieties: those with national

---

[2]  The Challenge Cost Share Agreement is the subject of Plaintiffs' current motion for a preliminary injunction.

ORDER GRANTING PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION * 3

memberships and those with a local focus. Defendant-Intevenors ("Intervenors") levy the following cross-claims in their answer (Ct. Rec. 10-3): (1) the closure of the Selkirk Crest is illegal under the National Forest Management Act ("NFMA") and arbitrary and capricious under the APA; (2) Defendants' Biological Opinions are arbitrary and capricious under the APA; and (3) Defendants have failed to conduct mandatory management action by prolonging a "temporary" closure to vehicles. Intervenors ask the Court to dismiss Plaintiffs' claims for relief, declare unlawful and set aside Defendants' restrictions on access to the Selkirk Crest, declare unlawful and set aside the Biological Opinions, and compel Defendants to initiate and complete management processes.

**FACTS**

## I.    Snowmobiling and its Effects on the Woodland Caribou

The Selkirk Mountains woodland caribou is listed as "endangered" under the ESA. 50 C.F.R. § 17.11. Its remaining population numbers about 33-35 animals, with most of the population located in southern British Columbia and a few found in northern Idaho. In its 2001 Amended Biological Opinion, the Service recognized that this population "is considered to be in decline and in danger of extirpation." Intervenors correctly assert that only a few caribou are likely to be found anywhere south of the Canadian border—the Idaho Fish and Game Department has found one to three caribou in several different areas of the Selkirk Mountains during surveys of northern Idaho over the last five years.

The winter habitat of the woodland caribou consists generally of high elevation areas, where they walk on top of the snow and feed on nutrient-poor lichen found above the snowline on mature and old-growth trees. There are groomed trails and snowmobile "play areas" throughout the Selkirk Mountains, including areas close to potential caribou habitat. In its Idaho Panhandle National Forest ("IPNF") 2001 Amended Biological Opinion, the Service states "[t]here is limited information on the effects of winter recreation on woodland caribou;

ORDER GRANTING PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION * 4

however, it is known that snowmobile use in winter habitats can displace caribou from important habitats or preclude their use of such habitat." USFS closed a 25-square-mile area to snowmobile access in 1994 to assist in caribou recovery.

Approximately 251 miles of snowmobile trails occur in the caribou recovery area within the IPNF every winter, 77 miles of which are groomed trails, and over 50,200 acres of play areas exist within the caribou recovery zone. An additional 791 miles of snowmobile routes exist in the Selkirks region outside the IPNF, including an additional 486 miles of groomed trails and another 125,000 acres of play areas. Many businesses, particularly in the Priest Lake region, rely heavily on revenues from snowmobile-related visits to the area.

**II.    Fish & Wildlife Service's 2001 Amended Biological Opinion**

The Service's 2001 Amended Biological Opinion ("BiOp") for the IPNF approved the 1987 Panhandle National Forest Plan, finding that any "take" of woodland caribou within the IPNF is "incidental to and not intended as part of the agency action . . . provided that such taking is in compliance with this Incidental Take Statement." The Incidental Take Statement's terms and conditions for woodland caribou include a non-discretionary requirement that USFS by January 2004 "develop and implement a comprehensive recreation strategy which identifies specific standards and restrictions necessary to protect caribou and their habitat on the IPNF." USFS has neither developed nor implemented such a strategy. The Service found a strategy was necessary because

> [w]inter recreation, particularly snowmobiling, is quickly becoming a significant threat to caribou, both through direct harassment and indirectly by potentially precluding caribou use of historic habitats and travel corridors. Snowmobile activity continues to rapidly expand throughout caribou habitat, and the existing standards are not specific enough to clearly address this growing problem. Protection of suitable habitat and travel corridors is essential to ensure that caribou have unrestricted access to available habitat.

(2001 Am. BiOp, at 53).

USFS did issue a "Situation Summary and Management Strategy for

ORDER GRANTING PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION * 5

Mountain Caribou And Winter Recreation on the Idaho Panhandle National Forests" ("Situation Summary") in March 2004.  However, this does not include a "strategy that clearly defines where recreational activities are appropriate and inappropriate to ensure the protection of caribou habitat effectiveness and minimize the potential for direct effects on individual caribou" as the Incidental Take Statement requires.  (2001 Am. BiOp, at 68).  Instead, the Situation Summary explains that "[t]his caribou winter recreation strategy . . . does not result in management decisions that change the current condition or policies.  The analysis that may result in access changes will be incorporated into the Forest Plan revision."

Assuming USFS had timely developed and implemented a compliant strategy, the Incidental Take Statement still cautions that "the Service is not able to issue a 'blanket' incidental take statement with a comprehensive list of reasonable and prudent measures to sufficiently cover all programs and actions subsequently implemented pursuant to the Forest Plan.  Individual actions that may result in take of woodland caribou will be subject to future site-specific consultation."  (2001 Am. BiOp, at 59-60).

### III.    The Challenge Cost-Share Agreement

The Idaho Department of Parks and Recreation, Bonner County, and the USFS/IPNF entered into the Challenge Cost-Share Agreement ("Agreement") in March 2004.  The parties state in the Agreement that they "have a mutual desire to work together in promoting and maintaining the snowmobile recreation program" in certain designated areas, including areas within IPNF.  USFS agrees among other things to meet with the other parties to develop annual operating plans and financial plans; authorize, "in accordance with applicable Federal requirements," forest system lands to be used in the snowmobiling and grooming program; provide assistance, funds, and personnel to aid the grooming program as funds and regulations allow; perform off-season maintenance; and monitor the routes to

ORDER GRANTING PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION * 6

ensure grooming is occurring.  The annual operating plan includes at a minimum

designated grooming routes and parking areas, among other requirements.

USFS has never conducted an ESA Section 7 consultation with the Service

regarding the IPNF Challenge Cost-Share Agreement.  Defendants assert that the

Agreement is not a license for snowmobiling and/or trail grooming in the IPNF;

rather, they submit that it serves "primarily" as a funding agreement whereby costs

normally born by the Federal government are shared by mutually interested parties.

Defendants state that the authorization for trail grooming and snowmobiling

predates the Agreement—that it was approved when the 2001 BiOp was issued,

and thus the Agreement does not require any additional Section 7 consultation.

Plaintiffs counter that although the Forest Plan and the 2001 BiOp address

snowmobiling in general, the Agreement is the only document that discusses trail

grooming.  Plaintiffs maintain that trail grooming was not an activity analyzed in

the 2001 BiOp.

### JURISDICTION & STANDARD OF REVIEW

Citizens and citizen groups are authorized under the ESA to file suit "to

enjoin any person, including the United States . . . who is alleged to be in violation

of any provision of this chapter or regulations issued under the authority thereof."

16 U.S.C. § 1540(g)(1).  Federal district courts have jurisdiction to enforce "any

such provision or regulation."  *Id*.

The usual standard for granting a preliminary injunction "balances the

plaintiff's likelihood of success against the relative hardship to the parties."  *Clear*

*Channel Outdoor Inc. v. City of Los Angeles*, 340 F.3d 810, 813 (9th Cir. 2003).

To obtain a preliminary injunction, Plaintiffs must demonstrate "either (1) a

likelihood of success on the merits and the possibility of irreparable injury; or (2)

that serious questions going to the merits were raised and the balance of hardships

tips sharply in [their] favor . . . ."  *Id*.  These standards are not separate tests; rather

they are along the same continuum.  *Id*.  Therefore, the greater the relative hardship

ORDER GRANTING PLAINTIFFS' MOTION FOR PRELIMINARY
INJUNCTION * 7

1    to the party seeking the injunction, the less probability of success must be shown.

2    *Id*.

3        By enacting the ESA, Congress altered the normal standards for injunctions

4    under Federal Rule of Civil Procedure 65.  The Ninth Circuit has consistently held

5    that "[t]he traditional preliminary injunction analysis does not apply to injunctions

6    issued pursuant to the ESA."  *Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv.*,

7    422 F.3d 782, 793 (9th Cir. 2005).  The Supreme Court stated that in enacting the

8    ESA "Congress has spoken in the plainest of words, making it abundantly clear

9    that the balance has been struck in favor of affording endangered species the

10   highest of priorities."  *TVA v. Hill*, 437 U.S. 153, 194 (1978).  "Accordingly, courts

11   may not use equity's scales to strike a different balance."  *Nat'l Wildlife Fed'n*, 422

12   F.3d at 794 (internal quotation omitted).

13       "The remedy for a substantial procedural violation of the ESA—a violation

14   that is not technical or *de minimus*—must therefore be an injunction of the project

15   pending compliance with the ESA."  *Wash. Toxics Coalition v. EPA*, 413 F.3d

16   1024, 1034 (9th Cir. 2005) (upholding an injunction prohibiting the EPA from

17   authorizing the use of certain pesticides within proscribed distances of salmon-

18   bearing waters until it had fulfilled its consultation obligations under Section

19   7(a)(2) of the ESA).  To show they are entitled to a preliminary injunction due to a

20   violation of the ESA, Plaintiffs must "make a showing that a violation of the ESA

21   is at least likely in the future."  *Nat'l Wildlife Fed'n v. Burlington N. R.R., Inc.*, 23

22   F.3d 1508, 1511 (9th Cir. 1994).  Plaintiffs argue that the circumstances of the

23   woodland caribou in this case require the Court to take particular care, stating that

24   "[t]emporary harms" during the consultation process "could lead to the permanent

25   harm of extinction."  *Defenders of Wildlife v. U.S. Envtl. Protection Agency*, 420

26   F.3d 946, 978 (9th Cir. 2005) (discussing potential harms to pygmy owl, which

27   records suggest numbers less than 100 in area under consideration; court discussed

28   this in its decision regarding what remedy to impose after finding agency action

ORDER GRANTING PLAINTIFFS' MOTION FOR PRELIMINARY
INJUNCTION * 8

1    arbitrary and capricious, not in context of motion for preliminary injunction).

2                                        **DISCUSSION**

3           Plaintiffs seek immediate injunctive relief prohibiting Defendant USFS from

4    implementing their "Challenge Cost-Share Agreement" for snowmobile trail

5    grooming on the IPNF during the winter 2005-06, to protect the endangered

6    Selkirk Mountains woodland caribou.  Plaintiffs are not requesting an injunction

7    ordering cessation of all snowmobiling in the IPNF; instead it appears they request

8    the Court to enjoin the grooming of certain trails within the IPNF.

9    **I.     Section 7(a)(2) of the ESA**

10          Section 7(a)(2) of the ESA provides: "Each Federal agency shall, in

11   consultation with and with the assistance of the Secretary, insure that any action

12   authorized, funded, or carried out by such agency . . . is not likely to jeopardize the

13   continued existence of any endangered species or threatened species . . . ." 16

14   U.S.C. § 1536(a)(2).  "Jeopardize" means to "reduce appreciably the likelihood of

15   both the survival and recovery of a listed species in the wild by reducing the

16   reproduction, numbers, or distribution of that species."  40 C.F.R. § 402.02.

17          An "agency action" under Section 7 of the ESA encompasses "all activities

18   or programs of any kind authorized, funded, or carried out, in whole or in part, by

19   Federal agencies in the United States" including "the granting of licenses,

20   contracts, leases, easements, rights-of-way, permits, or grants-in-aid."  *Id*.

21   "Section 7 and the requirements of this Part apply to all actions in which there is

22   discretionary Federal involvement or control."  *Id*. § 402.03.

23          The Supreme Court and the Ninth Circuit have interpreted "agency action"

24   broadly.  *Pacific Rivers Council v. Thomas*, 30 F.3d 1050, 1054-55 (9th Cir. 1994)

25   (citing *TVA v. Hill*, 437 U.S. at 173).  Where the agency retains ongoing decision-

26   making authority or control over the action, it has a continuing obligation to follow

27   the requirements of the ESA.  *Wash. Toxics Coalition*, 413 F.3d at 1033 (holding

28   that EPA had ongoing discretion over registration of pesticides and thus had a

ORDER GRANTING PLAINTIFFS' MOTION FOR PRELIMINARY
INJUNCTION * 9

1    continuing obligation to consult over those registrations); *Turtle Island Restoration*

2    *Network v. NMFS*, 340 F.3d 969, 974 (9th Cir. 2003) (holding that fishing permits

3    were ongoing agency actions because they entailed ongoing and lasting effects and

4    the agency had discretion to condition them to protect listed fish species).

5    **II.    Is the Challenge Cost-Share Agreement an Agency Action?**

6          Plaintiffs contend that the Agreement at issue here falls squarely within this

7    definition of "agency action," and thus USFS was required to consult with the

8    Service under Section 7 of the ESA.  Under the terms of the Agreement, USFS

9    does retain both control and "discretion to act."  *Turtle Island*, 340 F.3d at 974.  By

10   its terms, the Agreement commits USFS to authorize the use of IPNF lands,

11   consistent with applicable Federal requirements, for "snowmobiling and the

12   grooming program."  Defendants and Intervenors insist the Agreement is not an

13   agency action.  Instead, they assert it is a funding agreement, and they point to the

14   language describing the purpose of the Agreement: "to document the cooperation

15   among the parties for the groomed snowmobile trails program within the

16   boundaries of State Designated Snowmobile Areas #9A and 9B in Bonner

17   County."  Defendants and Intervenors assert that the language of the Agreement

18   shows implicitly that it simply recognizes the "snowmobile trail grooming

19   program" as an existing program already in place.

20         However, even if this authorization existed previously, the Agreement

21   memorializes that it is a continuing obligation.  The current Agreement's similarity

22   to past agreements does not mean it is not an "agency action" under Section 7(a)(2)

23   of the ESA.  *See, e.g.*, *NRDC v. Houston*, 146 F.3d 1118, 1125 (9th Cir. 1998)

24   (*renewal* of water contracts was agency action under ESA.  Particularly in light of

25   USFS's failure to implement a comprehensive recreational strategy as required in

26   the 2001 BiOp, the Agreement appears to be the only official policy put forth by

27   USFS regarding on-going authorization of snowmobile trail grooming within the

28   IPNF.  USFS maintains discretion over trail grooming by the terms of the

ORDER GRANTING PLAINTIFFS' MOTION FOR PRELIMINARY
INJUNCTION * 10

Agreement and can place conditions on its authorization.  In the Situation

Summary issued in March 2004, USFS recognized it had this continuing obligation

and authority.  The Situation Summary states that the rationale for continued

coordination with local snowmobile trail groomer committees is so the "Forest

Service would have a representative at scheduled grooming meetings to ensure that

all aspects of the grooming program on National Forest Lands meet Forest Plan

and other management direction."  Rule Decl. Ex. 10, at 33 (internal quotation

omitted).  This language necessarily implies that USFS has discretion and authority

under the Agreement to place conditions on the grooming program.

The Agreement further requires USFS to participate in the grooming

program on an on-going basis "as appropriations and regulations allow."  During

fiscal year 2004, USFS committed $8,100 to the program.  Additionally, USFS is

committed under the Agreement to participate in the development of annual

operating plans prior to each grooming season.  The annual operating plan must

include the designation of grooming routes and parking areas for snowmobile

access.

Defendants and Intervenors vigorously argue that the Agreement is not an

agency action, and that enjoining USFS's participation in the agreement would not

stop the grooming program as it currently exists.  They assert that grooming is

authorized through other documents (see discussion below), and that absent the

Agreement a private party could groom the trails and unimproved roads to aid

snowmobile access.  In response Plaintiffs cite to the Forest Service regulation

prohibiting "[c]onstructing, placing, or maintaining any kind of road, trail, . . . or

other improvement on National Forest System lands . . . without a special use

authorization, contract, or approved operating plan" with exceptions not relevant

here.  36 C.F.R. § 261.10(a).

The heart of this motion is whether the Agreement actually permits USFS to

authorize or condition trail grooming within the IPNF.  The Court finds

ORDER GRANTING PLAINTIFFS' MOTION FOR PRELIMINARY
INJUNCTION * 11

Defendants' and Intervenors' argument that grooming could freely occur without specific authorization is without merit. Both the regulation cited by Plaintiffs and common sense illustrate that a private individual or association could not freely maintain an unimproved road on Forest Service lands without authorization of some kind during the summer months. Grooming a road or trail for snowmobile access in the winter is analogous to maintaining a road for vehicle access in the summer. If a private group went to the IPNF with a snowcat or other grooming machine intending to groom trails, the Court believes and the regulation indicates that USFS could either deny them the opportunity or place conditions on their planned activities by limiting where they could groom, when they could groom, the size and/or type of equipment they could use, etc.

This discretion is implicit and explicit in the language of the Agreement at issue here. The Agreement states that USFS is "authorized by Acts of Congress and by regulations issued by the Secretary of Agriculture to regulate the occupancy and use of National Forest System lands." It also requires USFS to "[a]uthorize, in accordance with applicable Federal requirements, National Forest System lands in the areas indicated in the approved [annual operating plan] to be used for snowmobiling and the grooming program." Finally, the Agreement requires USFS to "[m]eet with the County and the Grooming Committee to develop the [annual operating plan] . . . prior to each grooming season." As mentioned above, the annual operating plan must designate grooming routes and parking areas. Even if the overall trail grooming program was authorized by the Forest Plan or another contract or action, the Agreement memorializes USFS's continuing discretion regarding trail grooming within the IPNF.

This conclusion is further bolstered by USFS's response to Plaintiff Selkirk Conservation Alliance's request under the Freedom of Information Act. Rule Decl., Ex. 34. Plaintiff requested copies of "any or all snowmobile grooming permits." USFS in its reply provided a copy of the Challenge Cost-Share

ORDER GRANTING PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION * 12

Agreement.  USFS's response to this request is not determinative that the
Agreement is a permit or an agency action, but it does show that USFS itself
characterized the Agreement as a permit, or at least as the closest document to a
permit that exists in its records.

The Agreement therefore meets the definition of "agency action" under
Section 7(a)(2).  USFS maintains control over authorization of IPNF lands for trail
grooming under the Agreement and it has a continuing commitment to assist in the
development of annual operating plans under the Agreement.  At the very least, the
Agreement qualifies as an individual action "that may result in take of woodland
caribou" and thus is "subject to future site-specific consultation."  2001 Am. BiOp,
at 59-60.  Finding that entering the Challenge Cost-Share Agreement is an "agency
action" under Section 7(a)(2) of the ESA, the Court holds USFS's failure to
consult before entering the Agreement is a clear procedural violation of the ESA.
Because the Court must strike the balance in favor of protecting the endangered
species when considering a motion for preliminary injunction, an injunction
pending consultation with the Service is the appropriate remedy.  *Wash. Toxics
Coalition*, 413 F.3d at 1034.

**III.    Was trail grooming approved in the 2001 Amended Biological Opinion?**

Defendants and Intervenors argue that to the extent the Agreement
memorializes USFS's involvement with the trail grooming program, it does not
require Section 7 consultation because the trail grooming program was previously
authorized by the Forest Plan and approved by the 2001 Amended BiOp.[3]

---

[3]  Although this issue was not raised during argument, the Court notes that
the applicability of the 2001 Amended BiOp is questionable due to USFS's failure
to comply with the "non-discretionary" requirements in the terms and conditions
for the Service's Incidental Take Statement.  These terms and conditions are
necessary for USFS "to be exempt from the prohibitions of section 9 of the

ORDER GRANTING PLAINTIFFS' MOTION FOR PRELIMINARY
INJUNCTION * 13

1    Defendants contend that the Forest Plan contains the "explicit" decision

2    authorizing snowmobiling and trail grooming within the IPNF.  To support this

3    assertion, they submit the Road Management Policy from the IPNF 1987 Forest

4    Plan.  The Road Management Policy states that it is USFS policy "that all roads on

5    National Forest lands shall remain open for public use unless there are sound

6    reasons in the interest of the public and/or resource protection for their closure."

7    The Road Management Policy further states that when deciding whether to close a

8    road to public access, one of the standard criteria USFS uses to assess the decision

9    is whether the road is a groomed snowmobile trail, defined as those "roads listed in

10   Cooperative Agreement with counties and . . . identified as key roads which

11   historically have been groomed several times a year."  In support of their position,

12   Defendants submit copies of past agreements similar to the Challenge Cost-Share

13   Agreement of 2004.

14       In rebuttal, Plaintiffs assert that the Road Management Policy in the Forest

15   Plan does not establish the trail grooming program, designate the trail system, or

16   authorize the County to groom the trails within the IPNF.  Therefore, Plaintiffs

17   maintain that but for the Agreement, trail grooming would not occur in the IPNF.

18   Plaintiffs mischaracterize the nature of the Agreement somewhat.  The Agreement

19   does not authorize or identify areas for snowmobile access and travel.  This activity

20   would occur absent USFS's participation in the Agreement through a continuing

21   land management process.  36 C.F.R. § 295.2(a).  Additionally, the evidence of

22   ───────────────────

23   [ESA]."  2001 Am. BiOp, at 61.  USFS was required to develop and implement a

24   recreational strategy by January 2004 that "clearly defines where recreational

25   activities are appropriate and inappropriate to ensure the protection of caribou

26   habitat effectiveness and minimize the potential for direct effects on individual

27   caribou."  *Id.* at 68.  USFS's Situation Summary, issued in March 2004, does not

28   fulfill these requirements.  *See* Rule Decl., Ex. 10.

ORDER GRANTING PLAINTIFFS' MOTION FOR PRELIMINARY
INJUNCTION * 14

1   prior similar agreements indicates that trail grooming was likely authorized

2   elsewhere.  However, the Agreement does specifically authorize and ensure

3   continuing USFS oversight of the trail grooming program within the IPNF.  This

4   continued discretionary involvement indicates that the Agreement does in fact

5   qualify as an agency action under Section 7(a)(2) of the ESA, as described above.

6   40 C.F.R. § 402.03.

7        Additionally, Plaintiffs cite two Ninth Circuit cases for the proposition that

8   site-specific or individual action consultations are necessary even when an activity

9   is generally approved in a Forest Plan.  In *Gifford Pinchot Task Force v. U.S. Fish*

10  *and Wildlife Service*, 378 F.3d 1059 (9th Cir. 2004), the Ninth Circuit considered

11  challenges to six different Biological Opinions which allowed for timber harvests

12  and which relied in part on the comprehensive Northwest Forest Plan ("NFP").

13  The court upheld the Biological Opinions because their analyses "did not rely

14  solely on the NFP, but conducted independent analyses of site-specific data."  *Id*. at

15  1067-68.  In *Lane County Audubon Society v. Jamison*, 958 F.2d 290 (9th Cir.

16  1992), the Ninth Circuit determined that both a timber sales "strategy" and

17  individual sales themselves required consultation with the Service, and it enjoined

18  any further sales until those consultations were accomplished.  *Id*. at 293.  These

19  cases are not directly on-point, for the individual actions (timber sales) taken

20  pursuant to a larger plan were perhaps more obviously "agency actions."

21  However, they are persuasive authority for the proposition that an overarching plan

22  containing general guidelines for future management, even if approved in a

23  Biological Opinion, does not give an agency carte blanche to perform all actions

24  pursuant to the plan without consultation under Section 7(a)(2).  This conclusion is

25  supported by the Service's own language in the 2001 BiOp requiring "future site-

26  specific consultation" for individual actions that may result in take of woodland

27  caribou.

28       Plaintiffs further point out that even if the trail grooming program is

ORDER GRANTING PLAINTIFFS' MOTION FOR PRELIMINARY
INJUNCTION * 15

1  authorized via the Forest Plan and not the Agreement, Defendants still failed to

2  consult over grooming because the 2001 BiOp contains no discussion about trail

3  grooming or its effects. This assertion is true for the most part. The 2001 BiOp

4  addresses general concerns about snowmobiling's effects on the woodland caribou,

5  most likely because the Forest Plan approved of snowmobiling in the abstract,

6  instead of granting specific approval for trails and play areas in particular

7  locations. The only reference to trail grooming in the 2001 BiOp occurs in its

8  discussion of the environmental baseline for woodland caribou, where it states:

9     Simpson and Terry (2000) indicate that, compared to other backcountry
   winter recreation activities, snowmobiling represents the highest
10  potential threat because of the overlap of caribou winter range and high
   capability snowmobile terrain. They characterize the primary concern
11  as displacement from late winter range, although they acknowledge that
   caribou on early winter ranges may be disturbed as well, typically due to
12  groomed snowmobile trails.

13  2001 Am. BiOp, at 48.

14      Therefore, whether or not trail grooming in the IPNF was authorized or

15  approved in earlier documents, the Agreement memorializes USFS's continued

16  discretion to authorize and place conditions on trail grooming within the IPNF.

17  Accordingly, it is an agency action under Section 7(a)(2) which requires

18  consultation.

19  **IV.  Delay**

20      Defendants and Intervenors both assert that Plaintiffs' delay in requesting

21  this injunction argues against granting it. Generally, a preliminary injunction

22  should not be issued where plaintiffs delayed seeking injunctive relief. *Lydo*

23  *Enters. v. City of Las Vegas*, 745 F.2d 1211, 1213 (9th Cir. 1984). Here,

24  Defendants and Intervenors argue that the Agreement was entered into in March

25  2004, 17 months before Plaintiffs filed this suit and 20 months before they filed the

26  present motion. Additionally, the parties submit that snowmobiling has been

27  occurring in the area since at least 1982.

28      However, the Ninth Circuit has held that laches is an appropriate defense to

ORDER GRANTING PLAINTIFFS' MOTION FOR PRELIMINARY
INJUNCTION * 16

a motion for an injunction only when the defendants can prove (1) unreasonable delay in asserting a known legal right, and (2) that the delay caused prejudice. *People of the Village of Gambel v. Hodell*, 774 F.2d 1414, 1427-28 (9th Cir. 1985). Defendants agree that delay alone is not sufficient reason to deny injunctive relief, but aver that along with other weaknesses in Plaintiffs' argument it militates for denial.

Plaintiffs assert that they have not been "sleeping on their rights." They state they have repeatedly sought to resolve their concerns through discussions with USFS, and they filed this suit only when it became apparent that the discussions were not going to result in any "on-the-ground changes." The Court finds that Plaintiffs did not unreasonably delay in asserting their rights, nor did any delay prejudice the Defendants.

**V.    The Scope of Plaintiff's Motion**

Intervenors also assert that Plaintiff's original motion simply requested the Court to enjoin the Challenge Cost-Share Agreement, and that permitting their motion to encompass an injunction of trail grooming would be unfair and beyond the scope of their motion. However, Plaintiffs filed their motion with the reasonable belief, based on the language of the Agreement and USFS's response to Plaintiff Selkirk Conservation Alliance's Freedom of Information Act request, that the Agreement was a snowmobile trail grooming permit, or the closest thing to it. The question of whether the Agreement was anything other than this was raised in the first instance by Defendants and Intervenors in their response memoranda. Defendants and Intervenors may not artificially limit Plaintiffs' motion through their own interpretation of the Agreement.

The Court has found that USFS has the discretion to permit, prohibit, condition, or otherwise limit its authorization for trail grooming through the Agreement. Therefore, the Agreement is an agency action, and as such may be enjoined in its entirety pending consultation. Plaintiffs did not expand their request

ORDER GRANTING PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION * 17

in their reply memorandum; rather, they refined their request, asking for an injunction that is more narrowly-tailored to the activities they believe may actually harm the woodland caribou and their habitat.  The Court finds this narrowly-tailored injunction is within the scope of Plaintiffs' original motion and appropriate pending the completion of Section 7(a)(2) consultation.

Accordingly, **IT IS HEREBY ORDERED**:

1.  Plaintiffs' Motion for a TRO and/or Preliminary Injunction (Ct. Rec. 35) is **GRANTED**.

2.  The grooming and plowing of designated parking areas for the following trails, which are either within or provide access to the caribou recovery area, is prohibited:

> Area 9A Trails:
> Trails 665 and 1013 from Mollie's Loop to Hemlock Loop;
> Trails 656 and 1127 making up Hemlock Loop;
> Trails 401 and 1015 from Hemlock Loop southeast past Boulder Meadows to the junction with Trail 1341;
> Trail 1341 from the junction with Trail 1015 south past Dusty Peak to the junction with Trail 302;
> Trail 302 from Hemlock Loop/Granite Pass south to junction with Trail 1362.

> Area 9B Trails:
> Smith Creek Trail #281, which leaves Hwy. 45/18 and heads southwest past Shorty Peak;
> All groomed trails in the Snow Creek, Ruby Creek, Falls Creek, Pack River, and Jeru Creek areas, including Trail 231 up to Harrison Lake, as well as designated parking areas at the Ruby Creek, Falls Creek, and Pack River trailheads.

3.  Plaintiffs' Motion for Leave to File Excess Pages (Ct. Rec. 45) is **GRANTED**.

///
///
///
///
///

**IT IS SO ORDERED.**  The District Court Executive is directed to enter this

ORDER GRANTING PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION * 18

Order and forward copies to counsel.

**DATED** this 20th day of December, 2005.


_s/Robert H. Whaley_
ROBERT H. WHALEY
Chief United States District Judge


Q:\CIVIL\2005\Defenders of Wildlife\PI.grant.ord.wpd

ORDER GRANTING PLAINTIFFS' MOTION FOR PRELIMINARY
INJUNCTION * 19