1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WASHINGTON

DEFENDERS OF WILDLIFE,
*et al.*,

        Plaintiffs,

        v.

SUSAN MARTIN, *et al.*,

        Defendants

        v.

IDAHO STATE SNOWMOBILE
ASSOCIATION, *et al.*,

        Defendant-Intervenor-Cross
Claimants.

NO.  CV-05-248-RHW

**FINDINGS OF FACT AND
CONCLUSIONS OF LAW**

18

19

20

21

22

23

24

     A bench trial was held in the above-captioned matter from February 12 to February 14, 2007, in Spokane, Washington.  Lauren Rule, Michael Leahy, and Richard Eichstaedt appeared on behalf of Plaintiffs; Joseph Kim and S. Jay Govindan appeared on behalf of Defendants; and Paul Turcke and Robert Caldwell appeared on behalf of Defendant-Intervenors.  These findings constitute the Court's final findings of fact and conclusions of law on the issues presented at trial as required by Federal Rule of Civil Procedure 52(a).

25

26

27

28

### PROCEDURAL HISTORY

     In their Complaint, Plaintiffs challenge two biological opinions issued by Defendants Martin and the U.S. Fish and Wildlife Service ("FWS" or "Service"), and actions by Defendants McNair and U.S. Forest Service ("USFS"), in violation

FINDINGS OF FACT AND CONCLUSIONS OF LAW * 1

1   of the Endangered Species Act ("ESA"), 16 U.S.C. §§ 1536 and 1538.  The

2   Complaint alleges Defendants are allowing the decline of the remaining woodland

3   caribou in the continental United States by implementing National Forest

4   management actions.

5        The Court granted Plaintiffs' first Motion for Preliminary Injunction by

6   Order on December 20, 2005 (Ct. Rec. 65).  Plaintiffs' motion was narrow in

7   scope, asking for an order enjoining Federal Defendants from implementing their

8   Challenge Cost Share Agreement ("CCSA") for snowmobile trail grooming in

9   certain areas of the Idaho Panhandle National Forest during the winter of 2005-

10  2006.  The Court granted the motion, finding that the CCSA was an agency action

11  under § 7(a)(2) of the ESA which required consultation with the Fish and Wildlife

12  Service before implementation (Ct. Rec. 65).

13       The Court next granted a stipulation filed by Defendants and Intervenors

14  dismissing Intervenors' cross-claims against Defendants (Ct. Rec. 123).

15       Subsequently, the Court denied Plaintiffs' second motion for partial

16  summary judgment and granted that of Defendants.  Those motions involved issues

17  surrounding the USFS's duty to consult under § 7(a)(2) of the ESA, and

18  Defendants re-initiated consultation before the Court considered the motions

19  rendering those issues moot (Ct. Rec. 126).  However, in the same order the Court

20  granted Plaintiffs' second motion for injunctive relief, which asked the Court to

21  issue an injunction to prohibit the Federal Defendants from authorizing

22  snowmobiling or snowmobile trail grooming in the "Caribou Recovery Area"

23  inside the IPNF until it had adequately *completed* consultation with the Fish and

24  Wildlife Service over the effects of these activities on woodland caribou (Ct. Rec.

25  126).

26       More recently, after receiving proposals from Plaintiffs and Defendants

27  regarding the proper scope of the injunction, the Court modified the scope of the

28  injunction by adopting Defendants' most narrow proposal (Ct. Rec. 140).  This

FINDINGS OF FACT AND CONCLUSIONS OF LAW * 2

1  proposal permitted snowmobiling in limited areas of the Caribou Recovery Area in

2  the IPNF in accordance with a plan developed by Forest Service and Idaho Fish

3  and Game experts.  After the Court modified the injunction, Plaintiffs filed a

4  motion to reconsider, asking the Court at least to prohibit snowmobiling in the

5  Smith and Beaver Creek drainages and in the Trapper Burn play area of the IPNF.

6  The Court denied that motion but decided that the best resolution of this issue was

7  to hear the evidence.  Therefore, the Court scheduled a bench trial on the issue of

8  whether Defendants violated § 7 and § 9 of the ESA by permitting snowmobiling

9  in the IPNF, and, if so, to determine the scope of any injunction (Ct. Rec. 149).

10      The last motion the Court decided was Defendant's request to limit the scope

11  of the evidence presented at trial to the Administrative Record.  Defendants argued

12  the proper procedural posture to decide the issues before the Court was through

13  motions for summary judgment, and that the Court should be limited by the APA

14  to considering the Administrative Record when determining whether the agency is

15  violating the ESA.  Consistent with the Court's earlier orders considering this

16  issue, the Court ruled that Plaintiffs' current claims are brought under the citizen

17  suit provision of the ESA, not the APA, and the Court may in its discretion

18  consider materials outside the administrative record.  *See Wash. Toxics Coalition v.*

19  *EPA*, 413 F.3d 1024, 1034 (9th Cir. 2005).

## FINDINGS OF FACT

21      The Selkirk Mountains woodland caribou is listed as "endangered" under the

22  ESA.  50 C.F.R. § 17.11.  At the time of listing in the early 1980s, the woodland

23  caribou's population in the United States was reduced to only 25-30 animals.  (Fish

24  & Wildlife Service Admin. R., at 00019 (hereinafter "FWS AR")).  Since 1987,

25  103 caribou have been transplanted into the region from other populations in

26  British Columbia to bolster numbers and help stabilize the population.  (*Id.*).

27  Nevertheless, its remaining population numbers between 35 and 45 animals with

28  most of the population located in southern British Columbia.  In its 2001 Amended

FINDINGS OF FACT AND CONCLUSIONS OF LAW * 3

1   Biological Opinion, the Service recognized that this population "is considered to

2   be in decline and in danger of extirpation," and the Court agrees. (*Id*.).  Experts for

3   both Plaintiffs and Defendants agreed with this assessment, noting that the current

4   population, although it has remained stable over the last several years, is not large

5   enough to guarantee the species's survival.  Only a few caribou are likely to be

6   found anywhere south of the Canadian border—the Idaho Fish and Game

7   Department has found one to three caribou in several different areas of the Selkirk

8   Mountains during surveys of northern Idaho over the last five years.  (Forest

9   Service Admin. R. D220, at 2 (hereinafter "USFS AR")).  Expert testimony

10  revealed caribou and signs of caribou have been spotted during winter aerial

11  surveys near Snowy Top just south of the Canadian border and in the Abandon

12  Creek and Selkirk Crest area since 2000.  (Exs. 36(a)-(e)).

13      The woodland caribou's habitat changes seasonally based in part on food

14  availability and optimal predator avoidance, along with other biological factors.

15  The seasonal habitats relevant in this matter are Early Winter, the habitat occupied

16  roughly from November to mid-January, and Late Winter, where caribou are

17  located roughly from mid-January to April or May.  During Early Winter,

18  woodland caribou are fairly active and generally make vertical movements

19  between open- and closed-canopy forests along slopes depending on snow

20  conditions.  In Late Winter, caribou take advantage of the consolidation of the

21  snow pack and their unique anatomy—dinner-plate sized hooves—to move up in

22  elevation mostly to avoid predation.  Their movements at that time are horizontal

23  along ridge lines, and they generally follow the height of the land.  During Late

24  Winter, woodland caribou feed on nutrient-poor arboreal lichen found above the

25  snowline on mature and old-growth trees.  The caribou suffer from a nutritional

26  deficit in Late Winter and typically move slowly to conserve energy, spending

27  much of their time bedded down to minimize their net energy loss.  A nutritional

28  deficit means that the caribou use more energy than they consume in the Late

FINDINGS OF FACT AND CONCLUSIONS OF LAW * 4

1   Winter and come out of the winter in a depleted condition.

2       Although no critical habitat has been designated for the population of

3   woodland caribou, a caribou recovery plan was developed in 1985 and revised in

4   1994.  (FWS AR, at 00017).  The recovery area outlined in the plan encompasses

5   approximately 2200 square miles in the Selkirk Mountains of northern Idaho,

6   northeastern Washington, and southern British Columbia.  (*Id*.).  About 53 percent

7   of the recovery area is within the United States, and about 57 percent (175,000

8   acres) of this area is within the IPNF.  (*Id*. at 00017, 00049).  After the 1994

9   revision of the Caribou Recovery Plan, USFS closed a 25-square-mile area of the

10  IPNF including the Selkirk Crest to snowmobile access to assist in caribou

11  recovery.  (*Id*. at 00057; USFS AR D220, at 2).

12      There are groomed trails and snowmobile "play areas" throughout the

13  Selkirk Mountains, including areas close to and in caribou habitat on federal, state,

14  and private land.  In its IPNF 2001 Amended Biological Opinion ("BiOp"), the

15  Fish and Wildlife Service states "[m]uch of the late winter habitat available for

16  caribou is being increasingly impacted by winter recreational activities (i.e.

17  snowmobile activity). . . .  As the remaining suitable late winter habitat is

18  increasingly infringed upon by winter recreationists, the potential increases for

19  caribou harassment and possible injury, as well as displacement from these key

20  habitats."  (FWS AR at 00021 (citation omitted)).  The experts testifying at trial all

21  agreed that interactions between snowmobiles and caribou should be avoided if

22  possible, and defense expert Timothy Layser testified that he would immediately

23  restrict snowmobiling in an area if caribou tracks were spotted in the vicinity.

24      While the impact of interaction between caribou and snowmobiles depends

25  on a number of factors, the generally weakened condition of caribou in the Late

26  Winter presents a significant threat to survival of caribou.  The Late Winter is the

27  period before the birth of calves.  Stress during this period of time can cause loss of

28  the fetus.  Displacement of caribou from familiar forage can cause deterioration of

FINDINGS OF FACT AND CONCLUSIONS OF LAW * 5

1   the health of the weakened animals.  Caribou benefit from the isolation provided
2   by high terrain during the late winter because predators generally cannot reach the
3   caribou because of the snow conditions.  Snowmobiles are not constrained by the
4   snow conditions and can and do reach the high elevations favored by caribou.
5   Snowmobiles in this proximity displace caribou in the same manner as predators,
6   defeating in part the purpose of the caribou's choice of high elevations to survive.
7       Before this suit commenced, approximately 77,000 acres within the caribou
8   recovery area were used by winter recreationists, including snowmobilers.  (USFS
9   AR D220, at 2).  There were about 50 miles of groomed snowmobile routes
10  mapped and permitted on national forest lands within the recovery area.  (*Id*.).
11  Although the actual area used by snowmobiles varies depending on snowfall and
12  snow conditions, aerial monitoring over the past several years has shown an
13  increasing level of use within areas such as open canopied timbered habitats.  (*Id*.).
14  The Forest Service reports this type of use was rare in the past.  (*Id*.).  This use
15  appears to directly overlap the late winter caribou habitat described in the 2001
16  IPNF Amended BiOp—"mature and old growth spruce-subalpine fir forests and
17  parkland."  (FWS AR, at 00018).
18      Studies have consistently found caribou presence in areas frequented by
19  snowmobiles decreases and recommend that snowmobiling be restricted from high
20  quality mountain caribou winter habitat or at least limited to a small proportion of
21  the total high quality habitat for each herd.  (Exs. 4, 5, & 6).  These findings have
22  been confirmed by first-hand observations of caribou behavior after interactions
23  with snowmobiles in the IPNF.  In the 1990s, snowmobile-caribou interactions led
24  to the Forest Service's closure of the Selkirk Crest area, and as recently as 2004
25  Forest Service Wildlife Biologist Layser received a credible report of a sighting of
26  two caribou that were "bumped" out of the Abandon Creek area during Late
27  Winter by snowmobiles in the area.  (Ex. 25).
28      A corridor permitting consistent travel between the northern and southern

FINDINGS OF FACT AND CONCLUSIONS OF LAW * 6

1 parts of the Caribou Recovery Area is critical to survival of the herd.  Plaintiffs'

2 expert Keith Simpson and other experts testified to the importance of protecting

3 caribou travel routes between southern areas and northern areas.  The experts

4 agreed maintenance of a travel corridor is critical to maintain the genetic linkage

5 within the population.  The experts disagreed on the necessity of maintaining a

6 travel corridor throughout the Late Winter season at this time, however.  Simpson

7 notes that the USFS's current snowmobile plans allow for snowmobile use that will

8 block movement between high quality habitat on the Selkirk Crest in Idaho and

9 habitat to the north and in Canada.  Defense experts generally testified that,

10 considering the current status and location of the population within the United

11 States, a travel corridor linking the Selkirk Crest and points farther north was not

12 vital at this time.  Defense experts were careful to limit this assessment to the short

13 term, universally stating that the long term recovery of the species would likely

14 require more restrictions and greater access through the travel corridor.  Defense

15 experts also disputed the propriety of the placement of the travel corridor through

16 the southwestern edge of the Trapper Burn area within the IPNF.  They stated this

17 followed the height of land, which caribou generally travel in late winter, but that

18 the area did not contain suitable late winter habitat due to the recent burn.  In other

19 words, defense experts agreed with Plaintiffs' experts that a travel corridor linking

20 the Selkirk Crest to points north was vital to the long term recovery of woodland

21 caribou, but they did not agree that it was vital at this time or that the corridor was

22 necessarily located where the Forest Service and the FWS have mapped it.

23     The Court finds that a travel corridor is necessary for the survival and

24 viability of the woodland caribou during the entire year.  Although this ruling is

25 limited in scope to the time Defendants take to complete consultation and develop

26 a winter recreation strategy in compliance with the ESA, the Court finds that

27 Defendants' distinction between long and short term planning for recovery is not

28 persuasive and does not adhere to the institutionalized caution mandate of the ESA.

FINDINGS OF FACT AND CONCLUSIONS OF LAW * 7

1  Considering the regrettably small number of caribou remaining in the United

2  States, small losses to the population in the short term could more easily lead to

3  extinction after the consultation process is complete.  *See Defenders of Wildlife v.*

4  *EPA*, 420 F.3d 946, 978 (9th Cir. 2005) (discussing potential harms to pygmy

5  owls, which records suggest numbers less than 100 in area under consideration).

6  The animals that remain in the southern part of the habitat are the progeny of

7  caribou that have retained the instinct to migrate north and south.  The continuation

8  of the travel of these few animals from north to south is critical to survival of the

9  herd.  Having no other evidence regarding the location of the travel corridor, the

10  Court finds it is located along the height of land that divides the Priest River from

11  the Kootenai River, commonly known as the Selkirk Crest.  This is the location

12  identified on maps and exhibits presented by both Plaintiffs and Defendants

13  throughout this litigation.

14       The Court further finds that the areas of prime winter habitat closed by the

15  present injunction are necessary to the survival of the remaining herd.  Caribou

16  move in unpredictable patterns for considerable distances during the Late Winter.

17  The presence of snowmobilers in the areas identified by the Forest Service as

18  prime winter habitat threatens the survival of the remaining herd because caribou

19  use the areas that were not previously closed to snowmobile traffic.

20                    **CONCLUSIONS OF LAW**

21       In the parties' pretrial stipulation, Plaintiffs identified the following three

22  claims to be presented and decided at trial, limited to the Forest Service's

23  management of the IPNF:

24       (1) ESA § 7(a)(1)—Defendant IPNF is violating ESA § 7(a)(1) by failing to

25       develop and carry out a program for the conservation of the woodland

26       caribou;

27       (2) ESA § 7(a)(2)—The IPNF is violating ESA § 7(a)(2) by authorizing

28       snowmobiling and trail grooming without insuring that these activities will

FINDINGS OF FACT AND CONCLUSIONS OF LAW * 8

1    not jeopardize the woodland caribou; and

2        (3) ESA § 9—The IPNF is violating § 9 by authorizing snowmobiling and

3        trail grooming that causes take of caribou through harm and harassment.

4    The Court has kept in mind that it has two tasks that, although significantly

5    intertwined in an evidentiary sense, have been considered separately.  First, the

6    Court determines Defendants' liability under the ESA § 7 and § 9 (whether an

7    injunction is appropriate).  Second, the Court determines the proper scope of

8    injunctive relief.

9        **A.    ESA § 7(a)(1)**

10        This is the only legal claim the Court has not seen previously in this

11   litigation.  Section 7(a)(1) of the ESA states that all federal agencies shall "utilize

12   their authorities in furtherance of the purposes of this chapter by carrying out

13   programs for the conservation of" listed species.  16 U.S.C. § 1536(a)(1).  "The

14   key term in [this] section, 'conservation,' means 'to use and the use of all methods

15   and procedures which are necessary to bring any endangered species or threatened

16   species to the point at which the measures provided pursuant to [the Act] are no

17   longer necessary.'"  *Pyramid Lake Paiute Tribe of Indians v. U.S. Dep't of Navy*,

18   898 F.2d 1410, 1416 (9th Cir. 1990) (quoting ESA § 3(3), 16 U.S.C. § 1532(3)).

19   The Ninth Circuit recognizes that agencies have an affirmative obligation to

20   conserve under § 7(a)(1).  *Id*. at 1416-17.  However, the agency has discretion to

21   decide how best to fulfill that mandate to conserve.  *Id*. at 1417.

22        Plaintiffs argue that Defendants therefore have an affirmative duty not only

23   to forestall the extinction of a species, but also to allow a species to recover to the

24   point where it may be de-listed.  *See Gifford Pinchot Task Force v. U.S. Fish &*

25   *Wildlife Svc.*, 378 F.3d 1059, 1070 (9th Cir. 2004).  In the context of a case

26   regarding the designation of critical habitat for a listed species, the Ninth Circuit

27   found that Congress clearly intended "that conservation and survival be two

28   different (though complementary) goals of the ESA."  *Id*.  The court explained that

FINDINGS OF FACT AND CONCLUSIONS OF LAW * 9

1   "conservation" "'is a much broader concept than mere survival'" and that the

2   ESA's definition of "conservation" "'speaks to the recovery of a threatened or

3   endangered species.'"  *Id.* (quoting *Sierra Club v. U.S. Fish & Wildlife Svc.*, 245

4   F.3d 434, 441-42 (5th Cir. 2001)).  Plaintiffs argue that Defendants' current focus

5   is simply on maintaining the population of existing animals, and that this falls far

6   short of the conservation mandate in § 7(a)(1).

7        Defendants assert that conservation measures are "voluntary measures that

8   the Federal [action] agency has the discretion to undertake to avoid or reduce

9   adverse effects of a proposed action that otherwise complies with the provisions of

10  section 7(a)(2)."  (Ct. Rec. 158, Defs.' Trial Br., at 2) (quoting 51 Fed. Reg. 19926,

11  19931 (June 3, 1986)).  The section of the Federal Register quoted by Defendants

12  discusses the definition of "conservation recommendations" in the expert agencies'

13  rules, and it "explains the [FWS]'s role in *helping* [action] agencies meet their

14  section 7(a)(1) responsibilities."  51 Fed. Reg. 19926, 19931 (emphasis added).  It

15  also states that "[e]ach Federal [action] agency has the responsibility to implement

16  its authority under section 7(a)(1)."  *Id*. at 19929.  The fact that the ESA "does not

17  mandate particular actions to be taken by Federal [action] agencies to implement

18  7(a)(1)" does not mean that action agencies do not have any mandate under §

19  7(a)(1).  *Id*. at 19934.  Indeed, § 7(a)(1) authorizes action agencies "to factor

20  endangered species conservation into their planning processes, regardless of other

21  statutory directives."  *Id*.

22       Defendants are correct in their assertion that § 7(a)(1) does not provide any

23  mechanism for applying its very broad goals to particular circumstances involving

24  particular species, and it does not mandate any particular actions, as opposed to §

25  7(a)(2) with its very specific consultation requirement.  *See id.*  Because the

26  requirements of this section are quite vague and left entirely up to the agency's

27  discretion, the best lens through which to judge Plaintiffs' claims under § 7(a)(1) is

28  the APA's "arbitrary, capricious, an abuse of discretion, or otherwise not in

FINDINGS OF FACT AND CONCLUSIONS OF LAW * 10

1  accordance with law" lens.[1]  5 U.S.C. § 706(2)(A).  The case law is clear that

2  Defendants are not required to perform any and/or all conservation measures

3  recommended by Plaintiffs or anyone else, for that matter, even the expert

4  agencies.  *See Pyramid Lake Paiute Tribe*, 898 F.2d at 1417.  Defendants presented

5  evidence of many actions they have undertaken and are undertaking for the

6  conservation and benefit of caribou and other endangered species within the IPNF.

7  The Court concludes Defendant Forest Service has not abused its discretion or

8  acted in an arbitrary or capricious manner in fulfilling its § 7(a)(1) obligations.

9      **B.      ESA §7(a)(2)**

10          Section 7(a)(2) of the ESA imposes a substantive duty in addition to its

11  procedural consultation requirement.  *Defenders of Wildlife v. EPA*, 420 F.3d 946,

12  950, 957 (9th Cir. 2005).  Federal agencies must "'insure' that [agency] actions are

13  'not likely to jeopardize the continued existence of any endangered species or

14  threatened species or result in the destruction or adverse modification of [critical]

15  habitat of such species.'" *Id*. at 950-51 (quoting 16 U.S.C. § 1536(a)(2)).  Section

16  7(a)(2) therefore "includes an affirmative grant of authority to attend to protection

17  of listed species within agencies' authority when they take actions covered by

18  section 7(a)(2)."  *Id*. at 965.  This grant of authority has been characterized as a

19  "do-no-harm obligation" on agencies when their own actions could cause harm to

20  an endangered species.  *Id*.  When consultation occurs, agencies must still operate

21  "under the assumption that all of section 7(a)(2)'s substantive requirements apply

22  to the action agency."  *Id*. at 966.

23          The Forest Service and FWS have reinitiated consultation in accordance

24  ───────────────

25      [1]  Under the deferential arbitrary and capricious standard, the Court must ask

26  "whether the agency considered the relevant factors and articulated a rational

27  connection between the facts found and the choice made."  *Pacific Coast Fed'n of
    Fishermen's Assoc. v. Nat'l Marine Fisheries Svc.*, 265 F.3d 1028, 1034 (internal

28  quotation marks and citation omitted).

FINDINGS OF FACT AND CONCLUSIONS OF LAW * 11

1    with § 7(a)(2) of the ESA.  While consultation is ongoing, § 7(d) of the ESA

2    provides additional guidance regarding the activities the Forest Service may

3    permit.  Section 7(d) of the ESA states:

4            After initiation of consultation required under subsection (a)(2), the
         Federal agency and the permit or license applicant shall not make any
5        irreversible or irretrievable commitment of resources with respect to
         the agency action which has the effect of foreclosing the formulation
6        or implementation of any reasonable and prudent alternative measures
         which would not violate subsection (a)(2) of this section.
7
8    16 U.S.C. § 1536(d).  This section was "enacted to ensure that the status quo would

9    be maintained during the consultation process, to prevent agencies from sinking

10   resources into a project in order to ensure its completion regardless of its impacts

11   on endangered species." *Wash. Toxics Coalition*, 413 F.3d at 1034-35.  Section

12   7(d) does not replace the requirements found in § 7(a)(2); rather, it "clarifies" those

13   requirements.  *Pacific Rivers Council v. Thomas*, 30 F.3d 1050, 1056 n.14 (9th Cir.

14   1994) (citation omitted).

15           In *Washington Toxics Coalition*, the Ninth Circuit held the burden of

16   establishing that an action is non-jeopardizing pending the completion of

17   consultation is on the agency.  *Id.* at 1035.  "Placing the burden on the acting

18   agency to prove the action is non-jeopardizing is consistent with the purpose of the

19   ESA and what we have termed its 'institutionalized caution mandate[ ].'"  *Id.*

20   Accordingly, it is Federal Defendants' burden to prove that continuing to permit

21   snowmobiling within the caribou recovery area is non-jeopardizing to the species.

22           The issue, therefore, is whether the current operation of the IPNF "insures"

23   the authorization of snowmobiling is not likely to jeopardize this population.  To

24   "jeopardize the continued existence of a species" means "to engage in an action

25   that reasonably would be expected, directly or indirectly, to reduce appreciably the

26   likelihood of both the survival and recovery of a listed species in the wild by

27   reducing the reproduction, numbers, or distribution of that species."  50 C.F.R. §

28   402.02.

             As discussed in the Court's findings of fact above, Defendants have not

FINDINGS OF FACT AND CONCLUSIONS OF LAW * 12

1  carried this burden as to the entire recovery area.  The Court finds that

2  snowmobiling in the vicinity of caribou and within and around areas of high

3  quality Late Winter habitat  jeopardizes the survival and recovery of the woodland

4  caribou.  It affects and reduces the distribution of the species and the opportunities

5  to breed among animals located in the northern and southern areas of the recovery

6  area.  Snowmobiling in prime winter habitat dislocates caribou from normal

7  feeding in a time of nutritional deficit and contributes to their already depleted

8  physical condition.  It is clear that caribou still inhabit IPNF land, even though the

9  numbers are regrettably small.  Caribou have been recently sighted close to federal

10  land in areas that are not currently closed to snowmobiling.  The evidence clearly

11  supports a finding that interaction between snowmobiles and caribou is harmful to

12  the animals.  At this population level, any harm even to a single animal could place

13  the entire population in jeopardy.  Accordingly, to insure no jeopardy, the areas

14  closed or limited by the Court's most recent injunction shall remain closed or

15  otherwise limited, as shall the travel corridor between the Selkirk Crest closed area

16  and points north.

17        **C.    ESA § 9**

18        Section 9 of the ESA makes it a crime to "take" any species listed as

19  endangered.  16 U.S.C. § 1538(a)(1)(B).  The term "take" is defined broadly to

20  mean "harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect, or to

21  attempt to engage in any such conduct."  16 U.S.C. § 1532(19).  The term "harm"

22  as used in the ESA includes any "significant habitat modification or degradation

23  where it actually kills or injures wildlife by significantly impairing essential

24  behavioral patterns, including breeding, feeding or sheltering."  50 C.F.R. § 17.3.

25  This definition includes "significant . . . modification or degradation" of a listed

26  species' habitat.  *See Babbitt v. Sweet Home Chapter of Cmties. for a Great Or.*,

27  515 U.S. 687, 691, 708 (1995) (upholding definition of "harm" in 50 C.F.R. §

28  17.3).  The term "harass" in the definition of "take" means "an intentional or

FINDINGS OF FACT AND CONCLUSIONS OF LAW * 13

1 negligent act or omission which creates the likelihood of injury to wildlife by

2 annoying it to such an extent as to significantly disrupt normal behavioral patterns

3 which include, but are not limited to, breeding, feeding, or sheltering." 50 C.F.R. §

4 17.3. The anti-take provisions of § 9 apply to all actors, not just the federal

5 government. *Defenders of Wildlife v. EPA*, 420 F.3d at 975. Section 9 protection

6 for endangered and threatened species is not considered as broad as that provided

7 in § 7 because "the Government cannot enforce the § 9 prohibition until an animal

8 has actually been killed or injured." *Sweet Home*, 515 U.S. at 703. This "after-the-

9 fact enforcement" does not prevent threats to listed species; that task is

10 accomplished through § 7. *Defenders of Wildlife v. EPA*, 420 F.3d at 975.

11        The Court finds the evidence supports its conclusion that "take" in the form

12 of harassment and harm has taken place in the past and is very likely to take place

13 in the future unless areas of high quality Late Winter habitat and an area

14 surrounding the travel corridor are closed to snowmobiling. The Supreme Court

15 has found that "harm" to an endangered species "may include significant habitat

16 modification or degradation where it actually kills or injures wildlife by

17 significantly impairing essential behavioral patterns, including breeding, feeding,

18 or sheltering." *Sweet Home*, 515 U.S. at 691 (quoting 50 C.F.R. § 17.3 (1994)).

19 The Ninth Circuit has found in the context of habitat degradation that an activity

20 may constitute a violation of § 9 even though the harm is indirect and prospective,

21 although Plaintiffs must show "'significant impairment of the species' breeding or

22 feeding habits and prove that the habitat degradation prevents, or possibly, retards,

23 recovery of the species.'" *Ariz. Cattle Grower's Ass'n v. Fish & Wildlife Serv.*,

24 273 F.3d 1229, 1238 (9th Cir. 2001) (quoting *Nat'l Wildlife Fed'n v. Burlington*

25 *N.R.R.*, 23 F.3d 1508, 1513 (9th Cir. 1994)).

26        Here, Plaintiffs have shown that continued snowmobiling within the area

27 subject to the current injunction as well as the travel corridor prevents, or at the

28 very least, retards, recovery of the woodland caribou within the United States. As

FINDINGS OF FACT AND CONCLUSIONS OF LAW * 14

1 | previously found, snowmobiling degrades the Late Winter habitat which

2 | significantly impairs the feeding and breeding habits of caribou and which has in

3 | the past resulted in actual injury to animals within the IPNF.  Evidence supports

4 | the conclusion that this type of harm and harassment is very likely to occur again

5 | in the future should snowmobiling be permitted in the areas now subject to the

6 | current injunction in addition to the travel corridor.  Therefore, the Court enjoins

7 | snowmobiling in this area pending the completion of consultation to prevent future

8 | violations of § 9 of the ESA.

9 | ### SCOPE OF INJUNCTION

10 | Pursuant to Federal Rule of Civil Procedure 65(d), the Court must tailor the

11 | relief ordered.  Fed. R. Civ. P. 65(d) (stating the order "shall be specific in terms;

12 | [and] shall describe in reasonable detail . . . the act or acts sought to be

13 | restrained").  As stated above, the Court has found that the habitat caribou *can*

14 | occupy is relevant both for the recovery of the species (long term) and for the

15 | interim consultation period (short term).  The Court finds the closure of other high

16 | quality habitat is necessary to insure no jeopardy and to prevent future take under §

17 | 7(a)(2) and § 9 of the ESA.  The Court's most recent injunction, as described in its

18 | November 7, 2006 Order (Ct. Rec. 140), remains in place to achieve these goals.

19 | In addition, the evidence reflects a necessity for a travel corridor available for

20 | movement through the Trapper Burn area, which is currently open as a

21 | snowmobile "play area" until April 1.  Therefore, the Court extends the injunction

22 | closure through a corridor that extends 2 kilometers on either side of the watershed

23 | throughout the length of the Trapper Burn play area.

24 | The Court recognizes that drawing lines is always difficult, and it asked the

25 | parties as the most knowledgeable about the landscape of the Trapper Burn area to

26 | confer to propose suitable boundaries for the closed area.  The parties could not

27 | agree on a proposal, and so submitted two proposals for the Court's consideration

28 | at a telephonic hearing on February 22, 2007 (Ct. Recs. 173 & 174).  Lauren Rule,

FINDINGS OF FACT AND CONCLUSIONS OF LAW * 15

1  Michael Leahy, and Richard Eichstaedt appeared on behalf of Plaintiffs; Joseph

2  Kim appeared on behalf of Defendants; and Paul Turcke appeared on behalf of

3  Defendant-Intervenors.

4      Plaintiffs' proposal is based in part on evidence not presented at trial and is

5  not wholly consistent with the evidence that was presented.  They ask for a four-

6  kilometer-wide area that is bordered on the east by the ridge line that marks the

7  boundary between Idaho State land and the IPNF and that falls completely within

8  the IPNF (Ct. Rec. 174).  The Court based its decision to close a four-kilometer

9  wide corridor on its understanding of the rebuttal testimony of Plaintiffs' expert

10 Keith Simpson, who testified that caribou follow the height of land in their

11 movements during the Late Winter season.  The Court found that the center of the

12 corridor is the ridge line, and its ruling provides a two kilometer buffer on each

13 side of the ridge line.  Defendants' proposal using the ridge line as the center point

14 more accurately reflects the Court's intent to create a corridor surrounding that

15 height of land (Ct. Rec. 173).  Moreover, the existence of another route to the east

16 of the closed corridor used by caribou to migrate north and south, as some defense

17 experts described in their testimony, is significant to the Court' delineation of the

18 corridor.

19     The Court recognizes that a part of the Court's proposed closed area falls on

20 Idaho State land and as such is outside the area over which Defendants exercise

21 jurisdiction.  Nevertheless, the Court believes Defendants' proposal is supported

22 by the evidence and most accurately reflects the Court's intentions.  The Court

23 expects Defendants, as members of the international, interagency Woodland

24 Caribou Recovery Team with agencies from British Columbia, Washington, and

25 Idaho, to encourage other member agencies to modify their own policies to best

26 protect and conserve the species in a manner consistent with the Court's Order.

27     Accordingly, for the foregoing reasons, **IT IS HEREBY ORDERED**:

28     1. Plaintiffs' claim under § 7(a)(1) of the ESA for the IPNF is **DISMISSED**

FINDINGS OF FACT AND CONCLUSIONS OF LAW * 16

1  and judgment is granted in favor of Defendants.

2       2.  Plaintiffs' claims under § 7(a)(2) and § 9 of the ESA for the IPNF are

3  **GRANTED** and judgment is granted in favor of Plaintiffs.

4       3.  The injunction as outlined in the Court's November 7, 2006 Order (Ct.

5  Rec. 140) **remains in place**.  This injunction is further modified with the closures

6  outlined in Defendants' Proposed Permanent Injunction Order (Ct. Rec. 173).

7  Defendants shall **file a final map and closure order** corresponding with their

8  proposal on or before **February 27, 2007**.

9       4.  This injunction will remain in effect until the completion of Defendant

10 IPNF's consultation with Defendant Fish and Wildlife Service and their release of

11 a Winter Recreation Strategy, in compliance with § 7(a)(2) of the ESA.

12      **IT IS SO ORDERED.**  The District Court Executive is hereby directed to

13 enter this Order and furnish copies to counsel.

14      **DATED** this 26th day of February, 2007.

15

16                             *s/ Robert H. Whaley*

17                       ROBERT H. WHALEY
                 Chief United States District Judge

18

19

20

  Q:\CIVIL\2005\Defenders of Wildlife\ffcl.ord.wpd

21

22

23

24

25

26

27

28

FINDINGS OF FACT AND CONCLUSIONS OF LAW * 17